IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN LABORERS PENSION FUND, and
JOHN J. SCHMITT (in his capacity as trustee),

                        Plaintiffs,                        OPINION AND ORDER

    V.

                                                          17-cv-403-wmc

GMS EXCAVATORS, INC.,

                        Defendant.

---

       The Wisconsin Laborers Pension Fund and John J. Schmitt, as its trustee (collectively, "the Pension Fund" or "the Fund"), are suing to collect withdrawal liability, interest, and penalties from defendant GMS Excavators, Inc., under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1301-1461. Before the court is the pension fund's motion for summary judgment (dkt. #11), which seeks to compel GMS (1) to make quarterly interim liability payments and (2) to pay interest, liquidated damages, and attorneys' fees. The pension fund also moves to sanction GMS (dkt. #25) for ignoring binding law and making frivolous arguments in opposing plaintiffs' motion for summary judgment. Defendant's sole basis for opposing entry of summary judgment is that GMS is not an employer covered under ERISA or the MPPAA. Because this issue must be decided in arbitration, and even then only after GMS begins making interim liability payments, the court will grant the Pension Fund's motions.

## UNDISPUTED FACTS[1]

### A. The Parties

As defined by ERISA, plaintiff Wisconsin Laborers Pension Fund is both a multiemployer pension plan and an employee benefit plan. Plaintiff John J. Schmitt is a trustee and fiduciary of the pension fund. As a fiduciary, Schmitt is authorized to bring actions to collect withdrawal liability payments.

Defendant GMS Excavators, Inc., is a Wisconsin corporation that specializes in road construction and road excavation, as well as sanitary sewer and water main construction. Since its 1994 creation, GMS has employed an average of two or three employees.

### B. Parties' Collective Bargaining Agreement

On July 24, 1996, GMS signed a letter of assent with the Wisconsin Laborers District Council. In doing so, GMS expressly adopted the June 3, 1996, collective bargaining agreement ("CBA") between the District Council and the "Municipal/Utilities Division, WI Chapter, Associated General Contractors of America Inc" and agreed to be bound by its terms until expiration. That agreement covered:

> All public works construction including construction, excavation, installation maintenance or repair of sewer and water mains, laterals, systems, and curbs and gutters, sidewalks, streets, landscaping, tunnels, shafts and appurtenances and related work, as well as excavating coming within the jurisdiction of the Union . . . within the State of

---

[1] Consistent with the parties' proposed findings of fact and responses, the court finds the following facts to be material and undisputed when viewed in a light most favorable to the defendant.

Wisconsin except for work contracted for by the State of
Wisconsin Department of Transportation.

(D's Resp. to PFOF (dkt. #19) ¶ 5.) The agreement further required that all covered work be performed in accordance with its terms, including a requirement that covered employers make pension contributions for each hour worked by covered employees. (*Id*. at ¶¶ 6-7.) Since 1996, multiple CBAs have been entered into between the Wisconsin Laborers Council and the Associated General Contractors of Wisconsin, requiring covered employers to contribute to the Pension Fund.

### C. GMS' Claimed Withdrawal

On March 30, 2001, GMS submitted a timely notice to the District Council to withdraw from the 1996 CBA. After submitting this notice, however, the parties dispute the degree to which GMS's actions contradicted its notice, particularly with respect to its practice of continuing to report new hires to the Union, and GMS's compliance with the District Council's announced increases in applicable fringe contribution rates. (D's Resp. to PFOF (dkt. #19) ¶¶ 9-10.) As to the former, GMS appears to acknowledge it continued reporting to avoid any disputes with the Union; as to the latter, GMS maintains its payment structure was following state prevailing wage rules, because it was legally required to do so for certain projects and it was easier to be consistent with respect to other projects, rather than because it met Union rates. Regardless, GMS argues it was not a party to any CBA after 2001, while the Fund maintains that relationship continued going forward.

3

On March 4, 2014, GMS sent a letter to the District Council again terminating their CBA. GMS also filed a petition with the National Labor Relations Board. On July 10, 2014, GMS obtained a formal decertification notice from the District Council.

GMS admits continuing to perform excavation and sewer work in several Wisconsin communities between July of 2014 and May of 2015. On May 6, 2015, the Pension Fund's board of trustees sent a letter notice to GMS, advising that it had incurred "withdrawal liability" of $328,776 and demanding payment in 60 quarterly payments of $8,640, with a final payment of $2,458. Based on its disagreement with the Fund's assessment of its withdrawal liability, GMS purported to "initiate" arbitration without beginning to make the quarterly payments that the Fund maintains are due and owing. An arbitrator has yet to be selected.

To date, GMS has made *no* payments towards its assessed withdrawal liability, and it continues to dispute that it is obligated to do so.

## OPINION

### I. Motion for Summary Judgment

In addition to being awarded interest, liquidated damages, and attorneys' fees incurred in replying to what they maintain was a frivolous opposition, plaintiffs seek to compel interim withdrawal liability payments. The outcome of this case turns on whether GMS remained an MPPAA covered employer after its 2001 notice to withdraw and, therefore, is obligated to pay withdrawal liability. If so, defendant must raise any objection to plaintiff's withdrawal liability calculation before an arbitrator after beginning to make

4

interim payments. While defendant disputes that it was a covered employer under the MPPAA for at least some portion of the period for which withdrawal liability is demanded, on the basis that it had withdrawn from the CBA, even that question is subject to compulsory arbitration. Because defendant was obligated to begin making the demanded, interim payments *before* arbitrating its disagreements with the assessment itself, the court will grant the motion for summary judgment.

**A. Background**

The MPPAA was enacted to address the risk of insolvency created by an employer's withdrawal from a pension plan. *See Central States, Se. and Sw. Areas Pension Fund v. O'Neill Bros. Transfer and Storage Co.*, 620 F.3d 766, 767-68 (7th Cir. 2010). It does so by making the employer "liable for an amount of money designed to cover the employees' share of vested, but unfunded, benefits." *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 261 (7th Cir. 1989). This "ensur[es] that employers cannot use withdrawal as a way of avoiding their full liability to participants whose benefits have vested." *Nat'l Shopman Pension Fund v. DISA Industries, Inc.*, 653 F.3d 573, 575 (7th Cir. 2011). When an employer withdraws, the plan sponsor must calculate the amount of withdrawal liability "[a]s soon as practicable," notify the employer, and demand payment. 29 U.S.C. § 1399(b)(1).

After receiving notice of its withdrawal liability, an employer has 90 days to "ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments," to "identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer,"

5

and to "furnish any additional relevant information to the plan sponsor." 29 U.S.C. § 1399(b)(2)(A). After a "reasonable review" of the employer's response, the plan sponsor must then notify the employer of its decision, the basis for its decision, and the reason for any change in its determination of the employer's liability or the payment schedule. *Id*. at § 1399(2)(B). If these determinations remain disputed, the parties are required to arbitrate. 29 U.S.C. § 1401(a)(1). Either party may initiate the arbitration "within a 60-day period after the earlier of (A) the date of notification to the employer . . . or (B) 120 days after the date of the employer's request." *Id*.

Importantly, an employer must generally begin making interim payments on schedule in a "pay now, dispute later" system. *Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 595 (7th Cir. 2008). After beginning payments, employers "must arbitrate the issue." *Id*. An employer's failure to make such payments, and to cure its failure to do so, constitutes a "default," which entitles the plan sponsor to full and immediate payment of *all* outstanding withdrawal liability and accrued interest. 29 U.S.C. § 1399(c)(5).

As noted, GMS argues that it need not begin making interim payments because after 2001 it was no longer an MPPAA employer subject to a CBA. Relying on the Seventh Circuit's decision in *Transpersonnel, Inc., v. Roadway Exp., Inc.*, 422 F.3d 456, 460 (7th Cir. 2005), for the proposition that a covered "employer" is "a person who is *obligated to contribute* to a plan either as a direct employer or in the interest of an employer of the plan's participants," GMS argues that it was not a signatory to *any* CBA after 2001, and therefore, it was no longer a covered employer under the MPPAA, making it appropriate for this court to decide the underlying issue of liability, rather than an arbitrator.

6

Whether ultimately right or wrong, GMS's argument puts the cart before the horse. When a party was once an MPPAA employer, the issue of whether it is no longer an employer during a period for which withdrawal liability is claimed itself "needs to be raised in arbitration." *Chicago Truck Drivers*, 525 F.3d at 598 n.1. This is because the question of continued employer status is "an inherently different problem from mere 'employer' status." *Banner Industries, Inc. v. Central States, Se. and Sw. Areas Pension Fund*, 875 F.2d 1285, 1293 (7th Cir. 1989).

In contrast, although GMS seems incapable of discerning the distinction, *Transpersonnel* concerned whether the defendant had *ever* been a covered employer, while GMS does not dispute that it was a covered employer for purposes of contributions to the Fund from 1996 until at least 2001. (D's Resp. to PFOF (dkt. #19) ¶¶ 5, 8.) Because the parties dispute only whether GMS withdrew in 2001 -- with the Pension Fund arguing that GMS *behaved* like a union contractor from 2001 to 2014 by allegedly notifying the union of new hires, withholding and remitting dues, and contributing to fringe benefits funds -- this issue must be decided by an arbitrator in the first instance. *Chicago Truck*, 525 F.3d at 598 n.1. Similarly, any equitable argument that the pension fund waited an unreasonable length of time to press its claim must also be addressed in arbitration. *Robbins*, 868 F.2d at 260.[2] As such, GMS had no principled basis to refuse to make interim withdrawal liability payments, pending resolution by an arbitrator, and the motion for summary judgment is granted.

---

[2] Any potential unfairness is further mitigated by the statute of limitations, and the fact that the pension fund does not appear to be seeking interim payments for quarters before 2015.

## II. Motion for Sanctions

The Pension Fund argues that GMS's opposition to its motion for summary judgment warrants sanctions under Fed. R. Civ. P. 11, as the argument that this court, rather than an arbitrator, may resolve the question of whether GMS remained an employer between 2001 and 2014 is frivolous. Instead of withdrawing this argument, GMS doubled down by opposing plaintiffs' motion for sanctions, and continuing to press its original argument based on *Transpersonnel* that no written agreement obligated it to contribute to the pension fund after 2001 -- continuing to ignore that unlike *Transpersonnel,* GMS had conceded that it *was* obligated under the parties' 1996 CBA through 2001. GMS also makes a convoluted argument that *Banner Industries* turned on the "evade and avoid" exception, ignoring that it must first "pay then dispute," consistent with the adopted policy of ensuring that pension plans remain funded under ERISA.

Accordingly, GMS will be responsible for the attorneys' fees and costs incurred by plaintiffs in preparing its reply brief on the motion for summary judgment, as well as interest on any overdue interim payments running from the date(s) due consistent with the average prime rate for the applicable years(s) compounded annually.[3]

---

[3] Plaintiffs appear to also seek their fees and costs incurred in moving for sanctions, but the court will deny that request since GMS's opposition to that motion was not frivolous. GMS also appears to dispute the reasonableness of the number of hours spent by plaintiffs' attorneys generally. To the extent that this dispute extends to time spent or hourly rates charged in preparation of the reply to its opposition to plaintiffs' summary judgment motion, defendant will be afforded an opportunity to do so, as set forth in the order below, keeping in mind that the best evidence of a reasonable fee is generally what the client was willing to pay and that any objection to the requested fees for preparation of the reply will trigger the defendant's obligation to disclose how much it paid for preparation of its opposition to the motion for summary judgment, as well as its counsel's underlying time records.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for summary judgment (dkt. #11) is GRANTED.

2) Plaintiffs' motion for sanctions (dkt. #25) is GRANTED IN PART with respect to plaintiffs' attorneys' fees and costs incurred in preparing their reply brief on the motion for summary judgment. The motion is otherwise DENIED.

3) Plaintiffs may have until Thursday, September 27, 2018, to provide this court with an affidavit setting forth defendant's liability for interim payments to date, including interest, and attorneys' fees and costs related to its reply on the motion for summary judgment, including the amount invoiced and paid for those services, along with counsel's underlying billing records. Defendant may then have until Monday, October 1, 2018, to raise any objections. If defendant objects to the amount of fees, by time spent or hourly rates, it shall produce records showing fees and costs incurred in opposition to plaintiffs' motion for summary judgment, including the amount invoiced and paid, as well as defense counsel's underlying billing records.

4) The court will hold a telephone hearing, if necessary, on any remaining disputes at 4:00 p.m. on Tuesday, October 2, 2018, with plaintiffs' counsel to initiate the call to the court.

Entered this 19th day of September 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge